# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Madeline Cox Arleo |
| | : | |
| v. | : | Mag. No. 13-8148 |
| | : | |
| ELIYAHU WEINSTEIN, | : | CRIMINAL COMPLAINT |
| a/k/a "Eli Weinstein," | : | |
| ALEX SCHLEIDER, and | : | **FILED UNDER SEAL** |
| AARON MUSCHEL | : | |

I, Karl Ubellacker, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached pages and made a part hereof.

_____
Karl Ubellacker, Special Agent
Federal Bureau of Investigation

Sworn to before me, and
subscribed in my presence

May 13, 2013 at
Newark, New Jersey

HONORABLE MADELINE COX ARLEO
UNITED STATES MAGISTRATE JUDGE

_____
Signature of Judicial Officer

**ATTACHMENT A**

**Count One**
**(Wire Fraud Conspiracy)**

From at least as early as in or about February 2012 through in or about May 2013, in Ocean County, in the District of New Jersey and elsewhere, defendants

**ELIYAHU WEINSTEIN,**
**a/k/a "Eli Weinstein,"**
**ALEX SCHLEIDER, and**
**AARON MUSCHEL,**

did knowingly and intentionally conspire and agree with each other, and with others known and unknown, to devise a scheme and artifice to defraud Victim G.C., and to obtain money and property from Victim G.C. by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing this scheme and artifice to defraud, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain signs, signals, and sounds, contrary to Title 18, United States Code, Section 1343.

In violation of Title 18, United States Code, Section 1349.

**Counts Two through Six**
**(Wire Fraud While On Pretrial Release)**

On or about the dates set forth below, in Ocean County, in the District of New Jersey and elsewhere, defendant

**ELIYAHU WEINSTEIN,**
**a/k/a "Eli Weinstein,"**

while on pretrial release pursuant to 18 U.S.C. §§ 3141 et seq., did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud and to obtain money and property from victims by means of materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing and attempting to execute this scheme and artifice, did knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce the following writings, signs, signals, pictures and sounds, each constituting a separate count of this Complaint:

| Count | Approximate Date | Description |
|-------|-----------------|-------------|
| 2 | February 7, 2012 | Wire transfer of approximately $1.2 million from an account in Jersey, Channel Islands to a 148 Investments LLC bank account in New Jersey |

| Count | Approximate Date | Description |
|-------|------------------|-------------|
| 3 | February 17, 2012 | Wire transfer of approximately $1.65 million from an account in Jersey, Channel Islands to a 148 Investments LLC bank account in New Jersey |
| 4 | February 27, 2012 | Wire transfer of approximately $2.5 million from the trust account of "Law Firm A," an international law firm headquartered in Miami, Florida, (the "Law Firm A Trust Account"), to a 148 Investments LLC bank account in New Jersey |
| 5 | April 19, 2012 | Wire transfer of approximately $311,075 from the Law Firm A Trust Account to a 148 Investments LLC bank account in New Jersey |
| 6 | March 5, 2012 | Wire transfer of approximately $1.825 million from an account in Jersey, Channel Islands to a 148 Investments LLC bank account in New Jersey |

In violation of Title 18, United States Code, Sections 1343 and 3147, and Title 18, United States Code, Section 2.

### Counts Seven through Thirteen
### (Transacting in Criminal Proceeds)

On or about the dates set forth below, in Ocean County, in the District of New Jersey, and elsewhere, defendants

**ELIYAHU WEINSTEIN,**
**a/k/a "Eli Weinstein," and**
**AARON MUSCHEL,**

knowingly engaged and attempted to engage in monetary transactions affecting interstate commerce in criminally derived property of a value greater than $10,000, such property having been derived from specified unlawful activity, that is wire fraud, in violation of Title 18, United States Code Sections 1343 and 2, as follows:

| Count | Defendants | Approximate Date | Monetary Transaction |
|-------|-----------|------------------|----------------------|
| 7 | WEINSTEIN and MUSCHEL | February 14, 2012 | A check for approximately $75,000 to a Newark law firm representing defendant WEINSTEIN in his pending criminal case in this district |
| 8 | WEINSTEIN and MUSCHEL | February 14, 2012 | A check for approximately $125,000 to a lawyer in Alabama representing defendant WEINSTEIN in his pending criminal case in this district |

| 9 | WEINSTEIN and MUSCHEL | February 14, 2012 | A check for approximately $15,000 to the law firm of the attorney acting as the Special Counsel described in paragraph 1(a) of the Complaint |
| 10 | WEINSTEIN and MUSCHEL | March 22, 2012 | A check for approximately $25,000 written to the firm of "D.G.," a former special agent with the Internal Revenue Service and a certified public accountant who was assisting defendant WEINSTEIN with his pending criminal case in this district |
| 11 | WEINSTEIN and MUSCHEL | March 19, 2012 | A check for approximately $15,000 to Co-Conspirator M.B., who was purportedly representing defendant WEINSTEIN in pending civil litigation |
| 12 | WEINSTEIN and MUSCHEL | March 19, 2012 | A check for approximately $15,125 to "A.L.," a broker that defendant WEINSTEIN had retained to find him investment opportunities |
| 13 | WEINSTEIN | December 20, 2012 | A check for approximately $1 million to Law Firm B, a large law firm based in New York, NY that began representing defendant WEINSTEIN in his pending federal criminal case on or about December 31, 2012 |

In violation of Title 18, United States Code, Section 1957 and Section 2.

## FORFEITURE ALLEGATION

The allegations contained in this Complaint are hereby realleged and incorporated by reference for the purpose of noticing forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

The United States hereby gives notice to the defendants that, upon their conviction of the offenses alleged in the Complaint in Counts 1 through 6, the government will seek forfeiture in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which requires any person convicted of such offenses to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense, including but not limited to:

      (a) 596 Seton Circle, Lakewood, New Jersey;
      (b) 1674 Whitten Rd, Memphis, TN 38134; and,
      (c) 6201 Poplar Ave., Memphis, TN 38134.

If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      (a) cannot be located upon the exercise of due diligence;

3

(b)  has been transferred or sold to, or deposited with, a third party;
(c)  has been placed beyond the jurisdiction of the court;
(d)  has been substantially diminished in value; or
(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described above.

## ATTACHMENT B

I, Karl Ubellacker, a Special Agent with the Federal Bureau of Investigation ("FBI"), having conducted an investigation and discussed this matter with other law enforcement officers who have participated in this investigation, have knowledge of the following facts. Because this Complaint is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts which I believe are necessary to establish probable cause. Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part.

### Relevant Entities and Individuals

1.      At all times relevant to this Complaint, unless otherwise indicated:

        a.      Defendant ELIYAHU WEINSTEIN, a/k/a "Eli Weinstein," was a resident of Lakewood, New Jersey. On October 27, 2011, a grand jury sitting in Newark, New Jersey, returned a 45-count Indictment (Crim. No. 11-701 (JAP)) against defendant WEINSTEIN, charging him with operating a massive Ponzi scheme in New Jersey and elsewhere from at least in or about 2004 through in or about August 2011 that resulted in approximately $200 million in investor losses. On January 3, 2013, defendant WEINSTEIN pled guilty to Count One of the Indictment (charging him with conspiracy to commit wire fraud) and Count Thirty-Six of the Indictment (charging him with transacting in criminal proceeds). Defendant WEINSTEIN currently is pending sentencing on these charges before the Hon. Joel A. Pisano, United States District Judge for the District of New Jersey. Given the nature of the charges against him and his conduct while on pre-trial release, since approximately October 14, 2011, defendant WEINSTEIN's conditions of release have, among other things, prohibited him from engaging in any monetary transaction in excess of $1,000 without the prior approval of a government-approved Special Counsel. In blatant violation of the terms of his pretrial release, since at least February 2012 and continuing through the present, defendant WEINSTEIN has engaged in a Byzantine series of monetary transactions without the approval of the Special Counsel, and contrary to federal criminal laws.

        b.      Defendant ALEX SCHLEIDER was a resident of Lakewood, New Jersey, who purported to broker investment opportunities in real estate and securities.

        c.      Defendant AARON MUSCHEL was a resident of Brooklyn, New York, who purported to be a real estate investor. Among others, defendant MUSCHEL controlled bank accounts in New York ending in 2415 (the "2415 Account") and 8620 (the "8620 Account").

        d.      "Co-Conspirator #1," a co-conspirator not named as a defendant herein, was a resident of Lakewood, New Jersey, and an attorney with offices in Seaside Heights, New Jersey and Los Angeles, California. Among others, Co-Conspirator #1 controlled an attorney trust account in New Jersey (the "Co-Conspirator #1 Trust Account").

        e.      "Co-Conspirator M.B.," a co-conspirator not named as a defendant herein, was once an attorney who previously had been admitted to practice law in Florida and Massachusetts. In or about October 1997, Co-Conspirator M.B. pleaded guilty to conspiracy to

possess cocaine with intent to distribute, in violation of Title 18, United States Code, Section 841, in the United States District Court for the Southern District of Florida.  On or about, June 25, 1999, Co-Conspirator M.B. was sentenced to 105 months' imprisonment.  Thereafter, Co-Conspirator M.B. resigned from the Florida Bar, but did not inform the Massachusetts Bar of his federal conviction or sentence.  Following his release from federal prison in or about August 2006, Co-Conspirator M.B. moved to the New Jersey area and resumed his law practice.  Among others, Co-Conspirator M.B. controlled an attorney trust account in New Jersey (the "Co-Conspirator M.B. Trust Account").  Beginning in or about October 2011 and continuing through the present, Co-Conspirator M.B. has represented defendant WEINSTEIN.  On or about December 7, 2012, however, Co-Conspirator M.B. was suspended by the Massachusetts Bar due to his prior, undisclosed conviction.

       f.    "Co-conspirator C.R.E.," was a resident of Lakewood, New Jersey, and worked in defendant WEINSTEIN's home as his personal assistant.  In that capacity, she notarized agreements, and facilitated financial transactions for defendant WEINSTEIN and his co-conspirators.

       g.    148 Investments LLC ("148 Investments") was a Delaware limited liability corporation established in or about October 2011 by defendant WEINSTEIN and Co-Conspirator #1 as an investment vehicle.  Defendant WEINSTEIN and Co-Conspirator #1 controlled 148 Investments, and conducted its alleged business through, among others, a bank account in New Jersey ending in 5080 (the "5080 Account"), and a bank account in New Jersey ending in 4131 (the "4131 Account").  Defendant WEINSTEIN had on-line access and a stock of blank, signed checks for both accounts, and conducted 148 Investments' business from, among other places, his home in Lakewood, New Jersey.

       h.    Victim investor G.C. ("Victim G.C.") was a resident of New Zealand, who was looking for investment opportunities in the United States.

       i.    "Attorney A" was a lawyer based in Lakewood, New Jersey that defendant SCHLEIDER introduced to Victim G.C.   Victim G.C. retained Attorney A to represent him in business transactions in the United States.

       j.    "Law Firm A" was an international law firm headquartered in Miami, Florida.

       k.    "Law Firm B" was a large law firm based in New York, NY that began representing defendant WEINSTEIN in his pending federal criminal case on or about December 31, 2012.

       l.    "Rabbi C.B." was a rabbi based in Brooklyn, New York, who controlled "Congregation K," also based in Brooklyn.  Congregation K owned life insurance policies on a number of different insured individuals worth approximately $350 million upon their deaths.  Congregation K was the beneficiary on these policies, and paid monthly premiums of over $1 million on them.  In or about October 2011, Rabbi C.B. sought a loan from defendant WEINSTEIN to help Congregation K pay the monthly premiums on the policies that it owned.  Thereafter, between on or about February 16, 2012 and on or about May 2, 2012, defendant

WEINSTEIN through 148 Investments loaned Rabbi C.B. and Congregation K at least approximately $3.88 million, all of which defendant WEINSTEIN and his co-conspirators derived from Victim G.C. pursuant to the scheme to defraud described below.

       m.    Facebook, Inc. ("Facebook"), was a Delaware corporation with its principal place of business in Menlo Park, California. Facebook operates a well-known social networking platform. Facebook completed its initial public offering ("IPO") on or about May 18, 2012, and its Class A common stock is listed on the NASDAQ Global Select Market under the symbol "FB."

## Overview of the Scheme to Defraud

    2.    From in or about February 2012 through in or about May 2012, defendants WEINSTEIN, SCHLEIDER and MUSCHEL, and Co-Conspirator #1, offered investors the opportunity to purchase large blocks of pre-IPO Facebook shares. At the time, the opportunity to purchase Facebook shares was particularly attractive because there was an expectation that Facebook's IPO was imminent, and that value of Facebook shares would increase dramatically following the IPO. As a result, it was extremely difficult to obtain large blocks of pre-IPO Facebook shares at the time. But in truth and in fact, and as defendants WEINSTEIN, SCHLEIDER and MUSCHEL, and Co-Conspirator #1, well knew, they did not have access to large blocks of pre-IPO Facebook shares.

    3.    Based on misrepresentations made by defendants WEINSTEIN, SCHLEIDER and MUSCHEL, and Co-Conspirator #1, Victim G.C. wired approximately $7.175 million from outside of the United States into 148 Investments' 5080 Account in New Jersey between in or about February 2012 and in or about March 2012 to fund the purchase of large blocks of pre-IPO Facebook shares. Rather than use Victim G.C.'s money to fund the purchase of pre-IPO Facebook shares as they represented, defendants WEINSTEIN, SCHLEIDER, and MUSCHEL, and Co-Conspirator #1, misappropriated Victim G.C.'s money for their own use and benefit. In some cases, they converted Victim G.C.'s money directly into the defendants' accounts through wires and checks issued from the 5080 Account. In other cases, after converting the money, the defendants moved Victim G.C.'s money between a number of different bank accounts to hide its origins before finally converting it to their own use and benefit. Among other things, defendant WEINSTEIN used Victim G.C.'s money to pay lawyers and experts representing him in his pending criminal case in this district, as well as to pay lawyers representing him in pending civil matters.

    4.    In some instances, defendant WEINSTEIN and his co-conspirators also used Victim G.C.'s money to make investments in a number of different businesses (unrelated to Facebook shares), and to extend loans to Rabbi C.B. and Congregation K in exchange for, among other things, interests in the life insurance policies that Rabbi C.B. and Congregation K controlled.

## The Scheme to Defraud

### A.   Facebook Transaction #1

5.      On or about February 1, 2012, defendant SCHLEIDER informed Victim G.C. that defendant WEINSTEIN had an "interesting deal involving Facebook's IPO," and asked Victim G.C. if he had an "appetite." During subsequent discussions, defendant SCHLEIDER informed Victim G.C. that defendant WEINSTEIN was seeking a $1.2 million investment. Victim G.C. informed defendant SCHLEIDER that he was interested, but would only make a secured investment given, among other things, the unpredictability of the stock market.

6.      Thereafter, defendants WEINSTEIN, SCHLEIDER and MUSCHEL agreed to offer Victim G.C. security for his investment, and Victim G.C. agreed to provide them a $1.2 million loan to fund the purchase of pre-IPO Facebook shares ("Facebook Transaction #1").

7.      On or about February 6, 2012, defendant SCHLEIDER sent Victim G.C. an e-mail (the "February 6th E-Mail") stating that he had worked "diligently" with Attorney A, who Victim G.C. had retained on defendant SCHLEIDER's recommendation, to secure Victim G.C.'s investment, and that "Eli provided us with a property owned by his partner Mr. Aaron Muschel whom I have done business with before and trust" to secure Victim G.C.'s investment in the Facebook deal. Defendant SCHLEIDER further stated that "[w]e all met in [Attorney A's] office where [defendant MUSCHEL] reviewed and signed all docs and [Attorney A] notarized them."

8.      The February 6th E-Mail contained a number of attachments, including a "Side Letter Agreement" signed by defendant MUSCHEL, which stated that defendant MUSCHEL was going to use Victim G.C.'s $1.2 million loan to "purchase 40,000 Facebook shares... at thirty dollars ($30.00) per share," and that "the shares shall constitute a portion of a total of 300,000 shares (hereinafter "the pool") which shall be owned and/or under the control of [defendant MUSCHEL]" and that defendant MUSCHEL "at his sole discretion, will sell the pool." The February 6th Side Letter Agreement further stated that Victim G.C.'s $1.2 million would be repaid no later than February 7, 2013, and Victim G.C. would receive the greater of 50% of the proceeds from the sale of the Facebook shares less broker's fees, or 12% interest on the money he loaned.

9.      The February 6th E-Mail also contained a "Balloon Note" signed by defendant MUSCHEL payable to Victim G.C. on or about February 7, 2012 in the amount of $1,344,000 – the $1.2 million loan plus 12% interest – and a "Mortgage" signed by defendant MUSCHEL on or about February 6, 2012, securing the Balloon Note with property defendant MUSCHEL owned in Tennessee (the "Tennessee Property").

10.     The February 6th E-Mail also forwarded an appraisal showing the "as-is" value of the Tennessee Property as $3.275 million in May 2006, and a Financial Statement for defendant MUSCHEL dated March 31, 2011 showing the value of the entity holding the Tennessee Property as $1.8 million, and defendant MUSCHEL's net worth as approximately $10 million.

11.     The Mortgage that defendant MUSCHEL provided to Victim G.C., however, falsely stated that it "constitute[d] a **first and paramount lien** on the [Tennessee Property.]"

4

(Emphasis added). As defendant MUSCHEL well knew, the Tennessee Property was encumbered by a March 23, 2007 first mortgage in the amount of approximately $2.415 million, which was not released until on or about June 12, 2012, and did not have enough equity to secure Victim G.C.'s $1.2 million loan.

12.     In reliance upon the representations above, among others, on or about February 7, 2012, Victim G.C. wired approximately $1.2 million from an account in Jersey, Channel Islands, to 148 Investments' 5080 Account in New Jersey to fund the purchase of pre-IPO Facebook shares. Based on my review of the 5080 Account, Victim G.C.'s money was not used to fund the purchase of pre-IPO Facebook shares. Instead, I have learned the following:

a.     Prior to Victim G.C.'s $1.2 million wire on February 7, 2012, the balance of the 5080 Account was approximately $100 – the amount used to open the account in or about December 2012.

b.     Between on or about February 7, 2012 and on or about February 8, 2012, defendant WEINSTEIN caused the transfer of approximately $1,000,000 of Victim G.C.'s money from the 5080 Account to the 4131 Account, which was also controlled by defendant WEINSTEIN and Co-Conspirator #1. Based on my review of the 4131 Account, Victim G.C.'s money was not used to fund the purchase of pre-IPO Facebook shares. Instead, I have learned the following:

i.     Prior to these transfers the balance of the 4131 Account was approximately $332.05.

ii.     On or about February 8, 2012, defendant WEINSTEIN caused a check to be written against the 4131 Account to "D.S.," defendant SCHLEIDER's brother, in the amount of approximately $101,333.33. Approximately two months earlier, in or about December 2011, an entity controlled by D.S. had purchased defendant WEINSTEIN's home out of foreclosure for approximately $397,661.

iii.     On or about February 8, 2012, defendant WEINSTEIN caused a check to be written against the 4131 Account in the amount of approximately $7,000 to Co-Conspirator M.B., a disbarred attorney, who was purportedly representing defendant WEINSTEIN in civil matters.

iv.     Between on or about February 8, 2012 and on or about February 10, 2012, defendant WEINSTEIN caused two checks to be written against the 4131 Account to defendant MUSCHEL, each in the amount of approximately $280,000; the memo line on one of the checks read: "Dep x2 Policies." These checks were deposited into an account in New York controlled by defendant MUSCHEL – the 8620 Account, where the money was neither used to purchase pre-IPO Facebook shares, nor for any other investment. Rather, it was used to, among other things, to fund:

1.     a check dated on or about February 14, 2012, for approximately $75,000 to a Newark law firm representing defendant WEINSTEIN in his pending criminal case in this district, which was cashed the following day;

5

2.     a check dated on or about February 14, 2012, for approximately $125,000 to a lawyer in Alabama also representing defendant WEINSTEIN in his pending criminal case in this district, which was cashed on or about February 17, 2012;

3.     a check dated on or about February 14, 2012, for approximately $15,000 to the law firm of the attorney acting as the Special Counsel described in paragraph 1(a) above, which was cashed the following day;

4.     two checks dated on or about February 14, 2012, totaling approximately $45,000 to a prior victim of defendant WEINSTEIN's criminal conduct; and

5.     a check dated on or about February 17, 2012, for approximately $15,000 to a "A.L.," a broker working on behalf of defendant WEINSTEIN.

All of the checks described above were signed by defendant MUSCHEL, and contained the initials "E.W." in their memo lines.

v.     Between on or about February 8, 2012 and on or about February 10, 2012, defendant WEINSTEIN caused two checks to be written against the 4131 Account to "J&N Invest LLC," each in the amount of $50,000. "J&N Invest LLC" is controlled by "J.R.," an individual with whom defendant WEINSTEIN has invested money unrelated to any Facebook transactions.

c.     On or about February 9, 2012, defendant WEINSTEIN caused approximately $200,000 to be wired from the 5080 Account to an account at JP Morgan Chase associated with "A.Q.," defendant WEINSTEIN's cousin.

**B.     Facebook Transaction #2**

13.     On or about February 10, 2012, defendant SCHLEIDER sent Victim G.C. the following e-mail proposing a second Facebook transaction ("Facebook Transaction #2"):

> BTW I presume you have satisfied your appetites for a while however since the IPO/S1 filing announcement last week it has gone viral they are now offering $44 a share… a large block of shares has been offered to Eli @ $32.50 from the same source which is $2.50 more than we previously paid. He has a buyer that is willing to come in @ $42.50 with a non-refundable deposit making it a great opportunity. Eli is putting together $16.250 MM to buy 500k shares and selling it for a $9 profit per share. It is a 2 week turnaround.

14.     In subsequent conversations, defendant SCHLEIDER informed Victim G.C. that the required investment for Facebook Transaction #2 would be $1.65 million, and the return would be the same as the first Facebook transaction – the greater of either 50% of the profits less any broker's fees, or 12% interest.

15.     As with the prior Facebook transaction, Victim G.C. agreed to invest in Facebook Transaction #2 only if his investment was secured, given, among other things, the unpredictability of the stock market.

16.     On or about February 16, 2012, defendant SCHLEIDER sent Victim G.C. an e-mail, copying Attorney A, who was representing Victim G.C., in which he wrote: "Eli provided us with a LLC owned by [Co-Conspirator #1] whom I have done business with before and trust... We all met in [Attorney A's] office where [Co-Conspirator #1] reviewed and signed all the docs..."

17.     The February 16, 2012 e-mail also forwarded a February 15, 2012 "Side Letter Agreement," which was notarized by Co-Conspirator C.R.E., defendant WEINSTEIN's personal assistant, who, at the time, worked out of his home in Lakewood, New Jersey.  Among other things, the February 15th Side Letter Agreement stated that to induce Victim G.C.'s investment, 148 Investments represented to Victim G.C. that it held assets valued at $12,000,000, and that Victim G.C.'s loan would be secured by a property located on Park Avenue, New York, NY (the "Park Ave. Property"), "which is encumbered by two mortgages held by 148 Investments, LLC [and] is worth, cumulatively $12,000,000."  Both representations were false.

18.     In reliance upon the representations above, among others, on or about February 17, 2012, Victim G.C. wired approximately $1.65 million from an account in Jersey, Channel Islands, to the 5080 Account in New Jersey.  Based on my review of the 5080 Account, Victim G.C.'s money was not used to fund the purchase of pre-IPO Facebook shares.  Instead, I have learned the following:

        a.     Prior to Victim G.C.'s approximately $1.65 million wire, the 5080 Account was overdrawn.

        b.     On or about February 17, 2012, defendant WEINSTEIN caused two separate $200,000 wires to be sent from the 5080 Account.  One was addressed to an entity in Switzerland, and another to an entity in Hong Kong.  Both of these wires related to investments that defendant WEINSTEIN was making in a gold deal in Africa for his own benefit, not in pre-IPO Facebook shares on behalf of Victim G.C.

        c.     On or about February 17, 2012, defendant WEINSTEIN caused approximately $400,000 of Victim G.C.'s money to be transferred from the 5080 Account to the 4131 Account, where defendant WEINSTEIN had previously transferred a large sum of Victim G.C.'s money allegedly for Facebook Transaction #1 (as described in paragraph 12(b) above). Based on my review of the 4131 Account, I know that defendant WEINSTEIN did not use Victim G.C.'s funds to buy Facebook shares or for any other investment on Victim G.C.'s behalf.  Instead, he used the money for his own personal use and business transactions.  Among other things, defendant Weinstein directed the following transactions:

                i.     On or about February 16, 2012, defendant WEINSTEIN caused a check to be written against the 4131 Account to D.S., defendant SCHLEIDER's brother, in the amount of approximately $201,333.33.  As discussed above, approximately two months earlier,

in or about December 2011, an entity associated with D.S. had purchased defendant WEINSTEIN's home out of foreclosure for approximately $397,661.

        ii.    On or about February 21, 2012, defendant WEINSTEIN caused a check to be written against the 4131 Account to fund a loan to "Congregation K" in the amount of $750,000, which Rabbi C.B. and Congregation K used to fund their life insurance investments, not to purchase pre-IPO Facebook shares.

## C.    The Belle Glade Gardens Transaction

19.    In or about February 2012, while the purported Facebook transactions discussed above were pending, defendant SCHLEIDER approached Victim G.C. with a real estate investment that defendant SCHLEIDER represented would be guaranteed by defendant WEINSTEIN and Co-Conspirator #1. Defendant SCHLEIDER told Victim G.C. that he had the opportunity to purchase an apartment complex in Miami, Florida called "Belle Glade Gardens" at a discounted price and immediately flip it at a substantial profit. To facilitate the transaction, defendant SCHLEIDER told Victim G.C. that he needed $2.5 million to be wired to the trust account of Law Firm A in Miami, Florida, where defendant SCHLEIDER claimed he already had $2.5 million held in escrow. In truth and in fact, and as defendant SCHLEIDER well knew, he never had $2.5 million in escrow at Law Firm A at any time.

20.    Defendant SCHLEIDER also represented to Victim G.C. that: (1) Victim G.C.'s money would remain in escrow at Law Firm A until the deal closed; (2) Victim G.C. would be repaid within 60 days; and (3) Victim G.C. would earn 12% interest during the period of the loan. As discussed below, these representations were also false.

21.    In reliance upon the representations above, among others, on or about February 23, 2012, Victim G.C. wired approximately $2.5 million from an account in Jersey, Channel Islands, to Law Firm A's trust account in Miami, Florida.

22.    On or about February 27, 2012, defendants SCHLEIDER and WEINSTEIN directed Law Firm A to wire approximately $2.5 million of Victim G.C.'s money from its trust account to the 5080 Account. Thereafter, defendant WEINSTEIN caused the following wires to be sent from the 5080 Account:

        a.    On or about February 27, 2012, defendant WEINSTEIN caused a wire for approximately $1.65 million to be sent from the 5080 Account in New Jersey to Victim G.C.'s account in Jersey, Channel Islands. Defendants WEINSTEIN and SCHLEIDER falsely represented to Victim G.C., that this money was the return of his principal from Facebook Transaction #2. In truth and in fact, however, it was a portion of the approximately $2.5 million that Victim G.C. believed he had invested in the Belle Glade Gardens transaction days earlier.

        b.    On or about February 29, 2012, defendant WEINSTEIN caused $177,750 to be wired from the 5080 Account to Victim G.C.'s account in the Cayman Islands. Defendant WEINSTEIN and SCHLEIDER falsely represented to Victim G.C. that this money was his profits from Facebook Transaction #2. In truth and in fact, however, it was a portion of the approximately $2.5 million that Victim G.C. believed he had invested in the Belle Glade Gardens transaction days earlier.

23.     Despite the above transactions, on or about April 16, 2012, defendant SCHLEIDER wrote Victim G.C. an e-mail in which he falsely stated that the closing of the Belle Glade Gardens transaction was imminent and that defendant SCHLEIDER and Victim G.C. should realize a gain of approximately $2.5 million.  In addition, defendant SCHLEIDER falsely represented that both he and Victim G.C. each still had "$2,500,000 in escrow totaling $5MM" in Law Firm A's trust account.

24.     Defendant SCHLEIDER subsequently asked Victim G.C. to invest an additional $330,000 in the Belle Glade Gardens transaction by promising a higher return on Victim G.C.'s initial investment, and by representing that Victim G.C.'s entire investment in the deal was secured, and would remain in escrow in Law Firm A's trust account until the transaction closed. Based on defendant SCHLEIDER's representations and the fact that he was led to believe that Facebook Transaction #2 was successfully concluded, Victim G.C. wired an additional $330,000 to Law Firm A's trust account on or about April 18, 2012, bringing his total investment in the purported Belle Glade Gardens transaction to $2.83 million.[1]

25.     On or about April 19, 2012, the day after Victim G.C.'s $330,000 wire was received in Law Firm A's trust account, defendants WEINSTEIN and SCHLEIDER directed Law Firm A to deduct any monies defendants WEINSTEIN and SCHLEIDER owed to Law Firm A and then wire the remaining money to the 5080 Account.  On or about April 19, 2012, Law Firm A wired approximately $311,075 to the 5080 Account, which defendant WEINSTEIN converted to his own use.  For example, defendant WEINSTEIN directed $140,000 of the money to be wired to the 4131 Account, where he used it to fund numerous personal debit card transactions, including paying for his children's private school tuition, meals and other personal expenses.

26.     On or about June 22, 2012, defendant SCHLEIDER sent Victim G.C. an e-mail in which he falsely stated that the Belle Glade Gardens transaction had closed.  In subsequent conversations, defendant SCHLEIDER requested wiring instructions from Victim G.C. for return of his principal and profit from the Belle Glade Gardens transaction.

27.     On or about November 2, 2012, defendant SCHLEIDER admitted to Victim G.C. that he had lied to Victim G.C. about the Belle Glade Gardens transaction, and that the fraud had been orchestrated by defendant WEINSTEIN.

**D.     Facebook Transaction #3**

28.     On or about February 29, 2012, defendant SCHLEIDER sent Victim G.C. the following e-mail proposing a third Facebook transaction ("Facebook Transaction #3"):

> I just got off the phone with [Co-Conspirator #1] & Eli they had given me a heads up on Monday that they were working on another [Facebook] tranche with a $10 spread weren't sure they could do it-they now advised me they are going in at $36.5 and have

---

[1] Victim G.C. funded this $330,000 wire using funds that defendants WEINSTEIN and SCHLEIDER had returned to Victim G.C. as purported profits from Facebook Transaction #2, discussed above, and Facebook Transaction #3 discussed below in paragraph 32(c)(2)(ii).

confirmed a buyer at $47.00 my family trust are taking 100k.  I thought I would let you know in case you still have an appetite they are looking for a minimum of 80k share blocks they believe that we might have one more shot after this one before the secondary trading stops.  Turnaround time is a max of 21 days 50/50 splits and 4.5% all the same as this last round.

29.    As with the two prior Facebook transactions, Victim G.C. agreed to invest in Facebook Transaction #3 only if his investment was secured.

30.    On or about March 4, 2012, Co-Conspirator #1 sent defendant WEINSTEIN an e-mail with the subject line "FW: Read this one…" that forwarded a proposed "Side Letter Agreement" dated March 4, 2012 between 148 Investments and Victim G.C. regarding Facebook Transaction #3.  The key provisions of this agreement were similar to the agreements purportedly securing the previous two fraudulent Facebook transactions discussed above, and included the following misrepresentations:

a.    "To induce [Victim G.C.] into making [a $1.825 million loan], [Co-Conspirator #1] on behalf of 148 Investments, LLC, makes the following warranties: (a) At a minimum, the value of the assets currently owned by 148 Investments, LLC is valued at $12,000,000.00"; and "(b) [the Park Avenue Property], the property which is encumbered by two mortgages held by 148 Investments, LLC is worth, cumulatively, $12,000,000.00."  Again, both of these representations were false.

b.    "Upon receipt of the loan proceeds described more fully in the Note and Security Pledge Agreement, 148 Investments, LLC, shall purchase or cause to be purchased 50,000 Facebook shares (hereinafter 'the shares') at thirty-three dollars ($36.50) per share."

c.    "The shares shall be sold at no less than forty-seven dollars ($47.00) per share."

d.    "148 Investments, LLC, at its sole discretion, will sell the 50,000 shares through a broker. It is anticipated that the shares shall be sold within twenty-one (21) days. However, the parties acknowledge that it may take up to sixty (60) days from after the loan is made to sell the shares."

e.    "The brokers will be deducting four-and-a-half percent (4½%) commission from the gross proceeds of the sale of the shares.  Any and all remaining proceeds will be split evenly between 148 Investment, LLC and [Victim G.C.], in accordance with… this Letter Agreement."

f.    "Accordingly, it is agreed between the parties that [Victim G.C.] shall be reimbursed $1,825,000 as principal and either fifty percent of remaining proceeds described in… this Letter Agreement or twelve percent (12%) interest, whichever is greater, as interest payment for the loan of $1,825,000."

10

31.    On or about March 4, 2012, defendants WEINSTEIN and SCHLEIDER, and Co-Conspirator #1 caused the March 4th Side Letter Agreement, which was signed by Co-Conspirator #1 on behalf of 148 Investments, to be forwarded to Victim G.C.

32.    In reliance upon the representations above, on or about March 5, 2012, Victim G.C. wired approximately $1.825 million from an account in Jersey, Channel Islands, to the 5080 Account in New Jersey.  Based on my review of the 5080 Account, Victim G.C.'s money was not used to fund the purchase of pre-IPO Facebook shares, or for any other investment on behalf of Victim G.C.  Instead, the money was used for defendant WEINSTEIN's personal benefit.  Among other things, I have learned the following:

a.    At or around the time of this transfer the balance of the 5080 Account was approximately $140,000.

b.    On or about March 6, 2012, defendant WEINSTEIN caused a check to be written against the 5080 Account to fund a loan to C.B. and Congregation K in the amount of approximately $375,000.

c.    On or about March 5, 2012, defendant WEINSTEIN caused approximately $1.6 million to be wired from the 5080 Account to the Co-Conspirator #1 Trust Account.  Thereafter, the following transactions occurred:

i.    On or about March 8, 2012, defendant WEINSTEIN caused approximately $200,000 to be transferred from the Co-Conspirator #1 Trust Account to the 4131 Account.  Next, defendant WEINSTEIN caused two checks totaling approximately $160,000 to be made out to defendant MUSCHEL's 2415 Account.  Thereafter, defendant MUSCHEL caused a series of checks to be written on the 2415 Account for the benefit of defendant WEINSTEIN, which included the initials "E.W." in their memo lines, including the following:

1.    A check dated on or about March 22, 2012, in the amount of approximately $25,000 written to the firm of "D.G.," a former special agent with the Internal Revenue Service and a certified public accountant who was assisting defendant WEINSTEIN with his pending criminal case in this district.

2.    A check dated on or about March 19, 2012, in the amount of approximately $5,575 to a law firm based in Hackensack, New Jersey.

3.    A check dated on or about March 19, 2012, in the amount of approximately $15,000 to Co-Conspirator M.B., who was purportedly representing defendant WEINSTEIN in pending civil litigation.

4.    A check dated on or about March 19, 2012, in the amount of approximately $5,000 to "Attorney G.G.," who previously represented defendant WEINSTEIN.

5.    Two checks dated on or about March 19, 2012, totaling approximately $16,500 to a family to whom defendant WEINSTEIN owed money.

11

      6.     A check dated on or about March 19, 2012, in the amount of approximately $15,125 to A.L., the broker that defendant WEINSTEIN had retained to find him investment opportunities.

      ii.     On or about March 14, 2012, defendant WEINSTEIN caused approximately $999,999 of the $1.6 million to be transferred back from the Co-Conspirator #1 Trust Account to the 5080 Account. Thereafter, the following transactions, among others, occurred:

      1.     On or about March 14, 2012, defendant WEINSTEIN caused a check to be written against the 5080 Account to fund a loan to Congregation K in the amount of approximately $750,000, which Rabbi C.B. and Congregation K used to fund their life insurance investments, not to purchase pre-IPO Facebook shares.

      2.     On or about March 14, 2012, defendant WEINSTEIN caused a wire in the amount of approximately $155,906 to be sent to Victim G.C.'s bank account in the Cayman Islands, which defendants WEINSTEIN and SCHLEIDER falsely represented to Victim G.C. were his profits from Facebook Transaction #3.

      3.     On or about March 29, 2012, defendant WEINSTEIN caused a check to be written against the 5080 Account to Co-Conspirator M.B. in the amount of approximately $100,000, with "Mr. M███" in the memo line. Thereafter, Co-Conspirator M.B. deposited the check into his attorney trust account in New Jersey. Three days later, on or about April 2, 2012, Co-Conspirator M.B. sent a wire for approximately $100,000 from his attorney trust account in New Jersey to an attorney trust account in Israel for a land deal in which defendant WEINSTEIN was involved. Indeed, in or about 2012, defendant WEINSTEIN caused approximately $620,000 to be sent from 148 Investments' 5080 Account to Co-Conspirator M.B.'s attorney trust account; the vast majority of the funds defendant WEINSTEIN transferred to Co-Conspirator M.B. originated from Victim G.C. Upon receiving these funds, Co-Conspirator M.B. caused at least $300,000 to be wired to entities in Israel for real estate investments on behalf of defendant WEINSTEIN. In addition, Co-Conspirator M.B. wrote checks against his attorney trust account to himself totaling in excess of $100,000, with "Weinstein" in the memo lines.

      iii.     On or about March 14, 2012, defendant WEINSTEIN caused approximately $200,666.66 of the approximately $1.6 million to be transferred from the Co-Conspirator #1 Trust Account to the 4131 Account, where defendant WEINSTEIN used it to fund a check in the amount of approximately $200,666.66 to D.S., defendant SCHLEIDER's brother, who had purchased defendant WEINSTEIN's home out of foreclosure for approximately $397,661 in December 2011.

**E.**     <u>**Victim G.C.'s Total Losses**</u>

      33.     From in or about February 2012 through in or about March 2012, defendants WEINSTEIN and SCHLEIDER, and Co-Conspirator #1 defrauded Victim G.C. of approximately $6.7 million: (1) approximately $3.025 million in connection with Facebook Transactions #1 through #3; (2) approximately $2.83 million in connection with the purported

purchase of Belle Glade Gardens; and (3) approximately $675,000 in connection with another fraudulent scheme not discussed herein.

34.     On or about November 12, 2012, defendant WEINSTEIN, Co-Conspirator #1, Co-Conspirator M.B., and Co-Conspirator C.R.E met in Lakewood, New Jersey and collectively drafted an e-mail to Victim G.C., copying Attorney A, which included the following false statements, among others:

   a.     "On 2/7/2012 you entered into a transaction with 148 Investments, LLC to speculate in the purchase of stock in Face Book, LLC, specifically by your agreement to loan $1.2 million for the purchase of 40,000 shares of FB at $30.00/share… [W]e will be responsible for the payment of the [full] principal by the second half of November, 2012."

   b.     "On 2/15/2012 you entered into an additional transaction with 148 Investments, LLC to speculate further in Face Book shares.  You wired us an additional $1.650 million per a loan agreement… whereby our affiliate purchased additional shares in Face Book. The transaction yielded you a profit, and was repaid on 2/28/2012 and 2/29/2012."

   c.     "On 3/5/2012 you continued your speculation of shares of Face Book. You wired us an additional $1.825 million as a loan for the purchase of yet another block of Face Book shares by our affiliate.  Your profit for this transaction was $155,906 which was [returned to Victim G.C.].  By your instruction, your principal was rolled over into [another investment] together with an additional investment of $675,000."

   d.     "These transactions reflect the decisions of a sophisticated investment strategy by you and your agents to reap significant return on investment in a niche market in the United States… While all monies due to you are accounted for, and will be paid out, you have never been guaranteed any more than that which you've received."

## F.     Defendant WEINSTEIN and his Co-Conspirators' Efforts to Avoid Detection

35.     Despite repeated assurances from defendants WEINSTEIN and SCHLEIDER, and Co-Conspirator #1, to Victim G.C. that his investments were secure and that all his principal as well as profit would be returned to him, only approximately $500,000 has been returned to Victim G.C. to date.  To further the scheme to defraud, however, defendant WEINSTEIN and his co-conspirators have provided Victim G.C. a number of bad checks to lull himG.C. into falsely believing that he would be repaid from the eventual sale of Facebook shares and from 148 Investments' overseas accounts.

36.     For example, on or about October 14, 2012, defendant MUSCHEL caused a check to be issued to Attorney A's trust account in the amount of approximately $1.214 million as partial repayment of monies owed to Victim G.C.  The check, which was drawn against an account defendant MUSCHEL maintained for one his corporations, bounced.

37.     Similarly, on or about February 26, 2013, defendant WEINSTEIN and his co-conspirators caused a check to be issued to Attorney A's trust account in the amount of $188,000 as partial repayment of monies owed to Victim G.C.  The check was provided by "Rabbi P," who

interceded on defendant WEINSTEIN's behalf to broker a settlement with Victim G.C.  That check also bounced.

### G.   Defendant WEINSTEIN's Use of Victim G.C.'s Money to Fund a $1 Million Payment to Law Firm B

38.   Rather than repay money to Victim G.C., defendant WEINSTEIN used $1 million of Victim G.C.'s money to pay his legal fees in December 2012.

39.   As detailed in paragraphs 18 (c)(ii), 32 (b), and 32(c)(ii), defendant WEINSTEIN loaned Rabbi C.B. and Congregation K approximately $3.88 million between on or about February 16, 2012 and on or about May 2, 2012.  Moreover, as further detailed in those paragraphs and others, defendant WEINSTEIN obtained the approximately $3.88 million that he loaned to Rabbi C.B. and Congregation K by defrauding Victim G.C.

40.   In or about December 2012, defendant WEINSTEIN and Rabbi C.B. discussed the repayment of loans that defendant WEINSTEIN and 148 Investments had made to Rabbi C.B. and Congregation K.  At the time, defendant WEINSTEIN had used Victim G.C.'s to fund loans in excess of $3.88 million to Rabbi C.B. and Congregation K.  In December 2012, Rabbi C.B. and Congregation K agreed to repay approximately $1 million of those loans.  Instead of repaying those funds to 148 Investments, defendant WEINSTEIN directed Rabbi C.B. to send a check from Congregation K for approximately $1 million to Law Firm B, which defendant WEINSTEIN was in the process of retaining for the trial of his then pending criminal case in this district.

41.   On or about December 20, 2012, Rabbi C.B. sent a check from a Congregation K bank account in the amount of $1 million to Law Firm B.  The memo line of the check read: "Loan Return for 148 LLC."

42.   On or about December 21, 2012, Law Firm B electronically presented Congregation K's $1 million check to its bank for deposit into its 4656 account.

43.   On or about December 24, 2012, the $1 million check cleared.

44.   On or about December 26, 2012, defendant WEINSTEIN informed Co-Conspirator #1 that a partner from Law Firm B was going to contact him to inquire about the origins of the $1 million check and that Co-Conspirator #1 should inform the partner that the money being forwarded to Law Firm A related to a transaction involving "Rappaport" and "Rottenberg" – although defendant WEINSTEIN and Co-Conspirator #1 well knew that the loans that Rabbi C.B. and Congregation K were repaying were originally funded by money fraudulently obtained from Victim G.C.

45.   On or about December 26, 2012, the Law Firm B partner contacted Co-Conspirator #1 about the $1 million check from Rabbi C.B. and Congregation K.  The partner informed Co-Conspirator #1 that the government had informed Law Firm B that it would seek to forfeit any funds associated with defendant WEINSTEIN if they were connected to his fraudulent activities.  The partner then asked Co-Conspirator #1 about the $1 million check, and Co-Conspirator #1 informed him that the money was from "Rappaport" and "Rottenberg" as

14

defendant WEINSTEIN had directed him.  The partner then asked Co-Conspirator #1 if he had ever met Rappaport or Rottenberg, and Co-Conspirator #1 stated that he had met Rottenberg once.  The entire conversation lasted minutes.

46.    On or about December 31, 2012, Law Firm B entered its appearance in defendant WEINSTEIN's pending criminal case.

47.    On or about January 3, 2013, defendant WEINSTEIN pleaded guilty to Count One of the Indictment against him (charging him with conspiracy to commit wire fraud) and Count 36 (charging him with transacting in criminal proceeds).  Defendant WEINSTEIN was represented by Law Firm B at his plea hearing, and is scheduled to be sentenced on these charges in June 2013 by the Hon. Joel A. Pisano.

48.    Following his guilty plea, the Court, unaware of the fraud described herein, continued defendant WEINSTEIN's conditions of release that had been previously established. Those conditions included the condition that defendant WEINSTEIN could not complete any financial transactions in excess of $1,000 without the prior approval of a Special Counsel approved by the Government.

### H.    Defendant WEINSTEIN's Recent Misrepresentations to Victim G.C.

49.    On or about February 18, 2013, defendant WEINSTEIN met with Victim G.C., Victim G.C.'s son ("Victim J.C."), and Attorney A at the Marriott Hotel in Teaneck, New Jersey to discuss Victim G.C.'s investments with 148 Investments and the return of their principal and profit.  Also present with defendant WEINSTEIN was "Dr. A.O.," who purported to be a wealthy investor backing defendant WEINSTEIN.  During the meeting, which was consensually recorded by Victim J.C., not at the direction of law enforcement, both defendant WEINSTEIN and Dr. A.O. made numerous misstatements regarding, among other things, the Facebook transactions discussed above.

50.    For example, defendant WEINSTEIN falsely stated to Victims G.C. and J.C. on multiple occasions that the money they provided to 148 Investments was, in fact, used to purchase Facebook shares: "We did three transactions in Facebook.  After they were completed. Sold.  Everybody made their money."

51.    During the meeting, defendant WEINSTEIN further claimed that he had returned Victim G.C.'s principal of approximately $1.650 million from Facebook Transaction #2:

**Defendant WEINSTEIN:**   You've got to trust me.  It's going to be hard for you because I'm the bad guy.  I'm the thief... I only made [defendant SCHLEIDER] money and I made you money.

**Victim G.C.:**   Where is it?

**Defendant WEINSTEIN:**    You made it!  I wired it [the $1.65 million] back to you... I didn't wire you back money?

52.    Concerning Victim G.C.'s approximately $2.83 million investment in the Belle Glade Gardens transaction, which defendants WEINSTEIN and SCHLEIDER transferred out of the Law Firm B Trust Account and used, in part, to return Victim G.C.'s alleged principal and profit from Facebook Transaction #2 and his alleged profits from Facebook Transaction #3, defendant WEINSTEIN falsely stated that the $2.83 million was invested in a fourth Facebook transaction: "$2.83 million.  [Defendant SCHLEIDER] put into Facebook on your behalf, or whatever the case is, that's available."  Victim J.C., however, clarified that the transfer "was never on our behalf."  In response, defendant WEINSTEIN falsely stated:

> That's what happened.  That's where the money is.  It was in Facebook.  **It's been in Facebook.  Facebook traded and made money, and it's available now.**  But you can't touch it right now because [Co-Conspirator #1] is the only signee on that account, unless we can get someone to take over the account.  (Emphasis added).

53.    Not only did defendant WEINSTEIN know that there were no Facebook transactions, he along with Co-Conspirator #1 had control of the 148 Investments bank accounts. Among other things, defendant WEINSTEIN had access to signed checks for the 148 Investments accounts and on-line access to them as well.  In fact, bank records and other records I have reviewed during the investigation reveal that defendant WEINSTEIN frequently accessed 148 Investments' bank accounts from his home.

54.    At another point during the February 18, 2013 meeting, defendant WEINSTEIN reiterated that defendant SCHLEIDER alone was responsible for the transfer of Victims G.C. and J.C.'s $2.83 million from Law Firm A's trust account to 148 Investments' account, and investing it in an alleged fourth Facebook transaction:

> The bottom line is that you have to get your money back.  The 2.8 of your money never came from you.  It came from [defendant SCHLEIDER]... **It's sitting in a Facebook transaction.**

> On the last transaction, he wired money from [Law Firm B] knowing that he was not going to do the deal with Belle Glade, which I told him he should go check out.  I made him go down to Florida.  He stayed in my unit in the hotel.  He checked out the Belle Glade, ah, property.  After that he signed promissory notes with 148 to invest the money.  So, he knew he was going to do the [fourth Facebook] transaction.  (Emphasis added).

55.    The following exchange also took place during the February 18, 2013 meeting concerning the Facebook transactions discussed above and the approximately $2.83 million transferred out of the Law Firm A's trust account by defendants WEINSTEIN and SCHLEIDER:

16

| | |
|---|---|
| **Defendant WEINSTEIN:** | All of [the Facebook transactions] are done.  Completed.  Completed.  Completed. |
| **Victim J.C.:** | Whoa!  Whoa!  Whoa! |
| **Victim G.C.:** | Facebook one is not completed. |
| **Victim J.C.:** | This one's not completed. |
| **Defendant WEINSTEIN:** | I didn't say completed. |
| **Victim J.C.:** | We thought it went into Belle Glade.  See, it was supposed to… |
| **Victim G.C.:** | We were told it went into Belle Glade.[2] |
| **Victim J.C.:** | We were told it went into Belle Glade, and then we found it didn't. |
| **Defendant WEINSTEIN:** | There is no Belle Glade.  Belle Glade never was purchased.  So the money. |
| **Victim G.C.:** | But no, the money that we, the money that we sent down for it the $2.83 went to 148.  The other. |
| **Defendant WEINSTEIN:** | You never bought Belle Glade. |
| **Victim G.C.:** | What happened to the $1.367 from Facebook number one? |
| **Victim J.C.:** | We were told that was completed? |
| **Victim G.C.:** | That's the money you're telling us you'll pay us now. |

---

[2] During the course of the fraudulent scheme discussed herein, defendant SCHLEIDER represented to Victim G.C. that his principal of $1.2 million and alleged profits of $167,000 from Facebook Transaction #1 was invested in the Belle Glade Gardens transaction.

| | |
|---|---|
| **Victim J.C.:** | Yeah, really. |
| **Defendant WEINSTEIN:** | That's in Facebook. It's still there. We never sold that. That's the same large deal. It's all in one deal. We bought 1,013,000 shares – that's $31 million Facebook. We took $1.2 plus 1-6-7, plus $2.83 million. |
| **Victim G.C.:** | We didn't. We didn't. We didn't authorize that. |
| **Defendant WEINSTEIN:** | I mean, what's the problem? |
| **Victim G.C.:** | The $1.2 million was due and payable. |
| **Defendant WEINSTEIN:** | Yeah! 148's transaction was 1.2. We finished that transaction. We sold the Facebook…[inaudible]… your profit of 167 plus 1.2. That money went for a fourth transaction in Facebook. The last transaction. |
| **Victim G.C.:** | Who said? We didn't. We didn't authorize that. |
| **Defendant WEINSTEIN:** | [Defendant SCHLEIDER] did. |
| **Victim G.C.:** | According to Alex, it went to 148 as you can see on there. |
| **Defendant WEINSTEIN:** | I understand. 148 bought Facebook shares. It didn't go to Belle Glade. You're telling me it went to Belle Glade… |

56.    Finally, during the meeting, defendant WEINSTEIN attempted to reassure Victims G.C. and J.C. that their best hope for recovering their money was to "work" with him: "If you guys are willing to work – really willing to work. Not, he said; she said. We can, we can, I think, that we can, we can satisfy you to a large extent the $2.8 outside of the 148 obligation through other businesses that we can leverage a little bit…"